IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


KENNETH D SCIPPIO,

       Plaintiff,

v.                                                                CASE NO. 1:07-cv-00118-MP-AK

FLORIDA COMBINED LIFE
INSURANCE COMPANY,

       Defendant.

_____/


# O R D E R

This matter is before the Court on the parties' cross-motions for summary judgment.

(Doc.  11, Defendant, Florida Combined Life Insurance Company, Inc.'s Motion for Final

Summary Judgment and Memorandum of Law in Support; Doc. 14, Plaintiff's Motion for

Summary Judgment with Supporting Legal Memorandum).  Both the plaintiff, Kenneth Scippio

("Scippio"), and the defendant, Florida Combined Life Insurance Company, Inc. ("FCL"), filed

responses to the opposing party's motion for summary judgment.  (Doc. 26, Plaintiff's Reply

Memorandum and Objection to Affidavit of Susan W. Colinett; Doc. 27, Defendant, Florida

Combined Life Company, Inc.'s Response to Plaintiff's Motion for Summary Judgment). FCL

filed the administrative record ("AR") of Scippio's claim with the Court.  (See Doc. 13, Notice

of Filing Administrative Record Under Seal).  For the reasons stated below, Scippio's motion for

summary judgment should be granted and FCL's motion for summary judgment denied.

FACTS:

    A. Scippio's Time on Disability

On April 1, 2004, Scippio was employed as a processing tech for Regeneration

Technologies, Inc. ("RTI"). (Administrative Record 819 (hereinafter A.R.)).  RTI provided its

employees, including Scippio, with a long term disability ("LTD") benefits plan ("Plan") that

was funded by a group long term disability policy issued by FCL.  (Doc. 4, Florida Combined

Life Insurance Company, Inc.'s Answer ¶ 2).  Scippio has not worked for RTI since April 1,

2004.  (AR 819).  Scippio maintains that his failure to return to work was the result of medical

problems which left him disabled under the terms of the Plan.  (See Doc. 1, Complaint ¶¶ 4-6).

When Scippio last worked at RTI he was being treated by Dr. Robert Ashley.  (A.R.

819).  At the time, Scippio's primary problems were Type II diabetes mellitus[1] and frequent

bouts of diarrhea.[2]  (AR 818).  Scippio's complaints regarding diarrhea first appeared on March

3, 2004, when he asked Dr. Ashley to send a note to his employer excusing him from work.

(A.R. 680).  Doctors' notes for diarrhea became a frequent occurrence for Scippio. (A.R. 680,

682, 695, 725, 730, 742).  Scippio was referred to Dr. Shea Ross in an effort to treat his diarrhea.

On April 24, 2004, Dr. Ross noted that Scippio reported moderate diarrhea resulting in

one watery bowel movement per day.  (AR 770-72).  Scippio also complained of nocturnal

bowel movements and fecal urgency.  (AR 771).  In a follow up visit on May 20, 2004, Dr. Ross

stated that Scippio's diarrhea had continued essentially unchanged since his last office visit and

seemed to occur more at night and following meals. (AR 768-69).  Dr. Ross also noted that all

stool studies had come back negative, but that occult blood was detected.  (AR 768-69, 777-82).

---

[1] Doctors later determined that Scippio's diabetes was actually Type I diabetes mellitus.
(AR 792).

[2] Scippio suffers from other medical problems, but the primary reasons for his disability
claim seem to be diabetes and diarrhea.  He also suffers from open angle glaucoma, (AR 676),
and leg pain and weakness. (AR 586-87).

Scippio underwent a colonoscopy on May 27, 2004, but nothing unexpected seems to have been found.  (AR 775).  Dr. Ashley referred Scippio to Dr. John Jones for treatment of his diabetes. On May 10, 2004, Dr. Jones noted that Scippio suffered from "severe hyperglycemia >400, accompanied by weight loss and diarrhea" and also noted that Scippio "has severe chronic diarrhea."  (AR 794).

On May 27, 2004, Scippio filed a short term disability claim with FCL and Dr. Ashley submitted a statement supporting Scippio's claim.  (AR 818).  In that statement Dr. Ashley noted that Scippio suffered from Type II Diabetes and frequent diarrhea.  (AR 818).  Dr. Ashley went on to note that Scippio's frequent diarrhea limits his ability to work because his work requires him to wear a protective suit.  (AR 818).  In response to Scippio's claim, FCL asked Dr. Ashley to clarify why Scippio was unable to work.  (AR 815).  Dr. Ashley responded and reiterated that Scippio suffers from frequent diarrhea and must wear protective equipment at work.  (AR 814). On June 1, 2004, Dr. Ashley noted that Scippio "feels he is unable to return to work with the limitation [of] his illness including multiple loose bowel movements.  I have written a request to extend his leave." (AR 743).  Dr. Ashley sent a letter to Regeneration Technologies asking for Scippio's leave to be extended for another three weeks. (AR 742).

By August 17, 2004, FCL was reviewing Scippio's medical records to determine his eligibility for LTD benefits. At that time, Karen Greenleaf reviewed Scippio's file for FCL and noted that "[Scippio] states he will have diarrhea after he eats and will go up to 5-6x.  AP . . . reports the diarrhea to be moderate, stools are watery, [Scippio] has abdominal pain, nocturnal bowel movements, fecal urgency. . . . Colonoscopy was normal. Dr. Jones . . . states . . . that [Scippio] has lost 20lbs over the last year, has fatigue and is not sleeping well." (AR 655).   On

August 18, 2004, FCL informed Scippio that he was being awarded LTD benefits beginning, retroactively, on June 30, 2004.(AR 649).  At that time FCL expected Scippio to recover and return to work fairly quickly (AR 608).

Sometime in December 2004, Dr. Nahum Beard assessed Scippio's ability to work. (AR 598-600).  Although Dr. Beard believed Scippio was physically capable of performing many tasks,[3] he did not believe Scippio could return to work full time, noting "patient also suffers from chronic diarrhea making work impossible for now."  (AR 599). Dr. Beard's notes from that office visit show that Scippio's diabetes was poorly controlled at the time.  (AR586-87).  The notes also state that  fecal urgency "has kept [Scippio] from working because he cannot get to a bathroom within a reasonable amount of time with his recent jobs." (AR 586).  A physical examination showed that Scippio was a "thin, cathectic-appearing . . . male with some temporal waisting . . . ." (AR 587).

On January 13, 2005, Dr. Beard noted that Scippio's "diarrhea continues unabated, usually 1 to 2 stools after he eats," likely due to bacterial overgrowth syndrome.  (AR 525).  On February 24, 2005, Dr. Beard noted that Scippio's diarrhea had continued but Scippio was eating more, gaining weight, and feeling somewhat better. (AR 523).  All lab workups relating to

---

[3]  Dr. Beard opined that Scippio could sit eight hours continuously, stand four hours intermittently, and walk eight hours intermittently.  (AR 598).  Dr. Beard also stated that Scippio could continuously lift up to 20 lbs, frequently lift up to 50 lbs, occasionally lift up to 100 lbs, and never lift over 100 lbs.  (AR 598).  Further, Scippio could continuously grab objects within his immediate reach, reach above his shoulders, handle objects, finger, and feel; frequently stoop and crawl; and occasionally climb, balance, kneel, and crouch.  (AR 598).  Dr. Beard noted that Scippio should not operate hazardous equipment as a result of his "insulin, currently poorly controlled." (AR 599)  Scippio also had a slight cardiac limitation.  (AR 599). Dr. Beard believed the limitations were temporary and expected improvement within 6-12 months.  (AR 599).

Scippio's diarrhea were negative at that point.  (AR 523).  However, his diabetes appeared to be

coming under control, and his weight was up to 135 pounds.  (AR 523).  At that time, Scippio

believed his diarrhea had slowed down enough to allow a return to work.  (AR 523).

On March 1, 2005, Marcia Knapp reevaluated Scippio's claim for FCL and, after

reviewing Scippio's records, noted that Scippio continued to be seriously ill.  (AR 577).  Knapp

noted that Scippio's "cachectic" appearance and temporal wasting reflect his ongoing diarrhea.

(AR 577).  Knapp also wrote that "until the [Scippio's] DM comes under better control and [his]

diarrhea is controlled it is reasonable that [he] does not have the ability to sustain any full time

work activity." (AR 577-78).  Knapp thought Dr. Beard's restrictions and limitations were

excessive, but believed Dr. Beard's recommendation of no work was reasonable. (AR 578).

On March 24, 2005, Scippio reported 3 to 4 very loose stools a day and was diagnosed

with malabsorption syndrome based on a laboratory test that found high levels of fat in his stool.

(AR 522).  On July 18, 2005, Dr. Vivien Osuorah noted that Scippio's chronic diarrhea was still

persistent and his weight had fallen to 115.6 pounds. (AR 518).  By August 2, 2005, Scippio's

weight was back up to 137 pounds. (AR 514). In October 2005, Dr. Osuorah was asked to

evaluate Scippio's ability to work. (AR 558-560).  Aside from stating that Scippio had a slight

cardiac limitation, Dr. Osuorah failed to express an opinion on Scippio's ability to return to work

writing "I am unable to comment on the client's physical capacities and I am referring him for

functional capacities assessment by physical therapy."  (AR 559).[4]

On February 9, 2006, Scippio filled out a disability questionnaire for FCL.  (AR 547-48).

---

[4]  It is unclear whether this assessment ever took place as the results are not in the
administrative record.

In that questionnaire Scippio stated that he cannot perform his own occupation because of "digestive problem uncontrollable bowel movements, no strength in legs very weak, and no energy always tired."  (AR 547).  In response to the question of what prevents him from engaging in ANY gainful employment at that time Scippio responded: "[a]fter I eat uncontrollable bowel movements back & forth to the bathroom all day."  (AR 547).

On June 15, 2006, FCL informed Scippio that his claim had been reviewed and FCL had determined that he was eligible for continuing benefits beyond June 30, 2006, the end date of the "own occupation" definition of disabled.  (AR 93,476).  On July 7, 2006, Shelly Leclere, a consultant employed by Concentra Integrated Services, Inc., interviewed Scippio for FCL.  (AR 472-73).  In the interview Scippio reported up to 5 stools daily and fatigue due to his increased heart rate.  (AR 472-73).  Leclere also accompanied Scippio to one of his appointments with Dr. Stefania Bray.  (AR 459).  During the appointment Scippio reported traveling to Miami for several weeks with friends.  (AR 459).  Scippio maintained that he had given himself his insulin shots as normally scheduled during the trip, but had not always eaten well or on time.  (AR 459).

Shortly after Scippio and Leclere's  appointment with Dr. Bray, FCL solicited Dr. Bray's opinion regarding Scippio's ability to return to work. (AR 452).  The request came in the form of a note on a fax cover sheet  from Mary Nan Murphy that stated:

> Dear Dr. Bray,
>                . . .
>                I understand that Mr. Scippio has some health challenges, however, his reported activity level is not consistent with someone unable to work.  By his own report he takes out of town trips and stays out late with friends.  His eating is therefore somewhat erratic and his loss of income has impacted his access to specialized medical care.  I am wondering what your impression is of his functional capacity.  Would you be willing to comment on any restrictions and limitations that he might have?  Do you think he is able to sustain sedentary activity required in a work environment?  Please see attached Attending Physician Statement.

> Dr. Bray, Mr. Scippio is a young man and if he is able to work, I am of the
> belief that this may be the best thing for him from a medical perspective.  It would
> normalize his schedule, provide him with an income and medical benefits and help
> him to become a contributing member of his community.
>      . . .
> Thank you,
> Mary Nan Murphy, R.N., B.S.N.

(AR 448).

Dr. Bray filled out the attached Attending Physician Statement. (AR 446-47).  On that

statement, Dr. Bray wrote that Scippio had the sustained tolerance to sit 8 hours, stand 2 to 3

hours, and walk 1 hour.  (AR 446).  Dr. Bray also said Scippio was capable of lifting up to 30

pounds occasionally, (AR 446), but he did have a slight cardiac limitation.  (AR 447).  Although

Scippio had not reached maximum medical improvement and needed close follow up of his

diabetes, Dr. Bray circled "Without Restrictions" when asked the date she believed Scippio

could return to work.  (AR 447).  Dr. Bray faxed the Statement back to FCL and included

Murphy's cover sheet with the following portion underlined:

> By his own report he takes out of town trips and stays out late with friends.  His
> eating is therefore somewhat erratic and his loss of income has impacted his access
> to specialized medical care.  I am wondering what your impression is of his
> functional capacity.  Would you be willing to comment on any restrictions and
> limitations that he might have?  Do you think he is able to sustain sedentary activity
> required in a work environment? Please see attached Attending Physician Statement.

(AR 445).

FCL received Dr. Bray's report and had Mary Paine O'Malley, of MPO Consulting,

perform an Employability Assessment based on the tolerances Dr. Bray specified in her

statement.  (AR 438-41). O'Malley's assessment identified four occupations that Scippio would

be capable of performing based on Dr. Bray's assessment.  These were: small products

assembler, surveillance system monitor, parking or cafeteria cashier, and ticket seller.  (AR 439).

These jobs are entry level positions that can be learned through on the job training and typically

provide an opportunity to take scheduled lunch breaks and/or scheduled 10-15 minute breaks within the work shift.  (AR 440).  These positions would provide Scippio with a "gainful" wage. (AR 437).

Based on Dr. Bray's assessment and O'Malley's follow up assessment, FCL informed Scippio that he no longer met the definition of disabled under the Plan, and his LTD benefit payments would not continue past September 30, 2006.  (AR 408).  After FCL terminated his benefits, Scippio consulted with an attorney who contacted FCL to request all materials FCL possessed that were relevant to an administrative appeal of Scippio's claim.  (AR 400-02).

B.  Scippio's Administrative Appeal

1.  *Scippio's Submissions for Administrative Appeal*

On March 10, 2007, Scippio requested a formal administrative appeal and submitted additional evidence supporting his claim to FCL.  (AR 336).  The evidence included: 1) photographs documenting episodes of diarrhea Scippio had during the week of January 2, 2007; 2) two statements from Scippio; 3) a form filled out by Dr. Bright; 4) Dr. Bray's written responses to written questions posed by Scippio's counsel; and 5) a vocational assessment by Gil Spruance.  (AR 336).

Scippio submitted 14 photographs to CDS as part of his formal appeal.  (AR 369-75). The administrative record on file with the Court only contains copies of those photographs, so it is impossible to tell exactly what they show.  However, they clearly show a toilet bowl, so I assume they depict episodes of Scippio's diarrhea.  These pictures were taken during the week of January 2, 2007.  (AR 359).

The first statement Scippio submitted on appeal states that the week of January 2, 2007,

(the week the photos were taken), was a typical week for him, he had good days and bad days. (AR 359).  Some days during the week he had a total lack of energy and was not able to do much of anything.  (AR 359).  Several days during the week he had multiple bouts of diarrhea and often felt tired after these episodes.  (AR 359).  He also limited his meals during the week to try to control his diarrhea. (AR 359).  Scippio hoped his diarrhea could be treated so he could eat better, which would in turn allow him to control his diabetes better.  (AR 359).  If that is accomplished he hopes to "regain [his] energy and return to gainful employment."  (AR 359).

Scippio's second statement responds to Murphy's cover sheet note to Dr. Bray (AR 448). (AR 360).  Scippio states that he seldom hangs with friends, and when he does visit his friends he is almost always home by 9 p.m. (AR 360).  Scippio also discussed the trip he took to Miami the previous year.  Scippio state that he took frequent bathroom breaks and tried to control his diarrhea by fasting during the trip.  (AR 360).  He also noted that fasting makes it more difficult to control his diabetes.  (AR 360).   Finally, he attributed his failure to comply with doctors' recommendations on his inability to afford medical treatment.  (AR 360).

Scippio also submitted a form Dr. Phillipa Bright filled out on January 23, 2006 as a result of Scippio requesting assistance from the Alachua County Department of Community Support Services.  (AR 355).  On the form, Dr. Bright wrote that Scippio would be unable to work for 12 months due to "poorly controlled DM [and] chronic GI malabsorption."  (AR 355). Dr. Bright's prognosis for Scippio was a "likely decline."

Along with Dr. Bright's assessment, Scippio also submitted written responses Dr. Bray gave to questions Scippio's counsel asked her. (AR 356-358).  The questions and answers are as follows:

1.  The last note I have authored by you is dated 7/18/06 and at that time your diagnosis was diabetes mellitus uncontrolled, sinus tachycardia, history of diarrhea and fat mal-absorption, proteinuria in a patient that has uncontrolled diabetes.  Are these your current diagnoses, as of your last date of treatment, and have they been confirmed by objective evidence such as lab tests, studies or clinical evaluations?

[Did not check yes or no]

Comments: My last note is actually dated 8/2/06 as per this package.  My diagnoses are as stated in the notes.  I can not say that those are correct per today's date.  We had blood work and tests done, however as for diarrhea and fat-malabsorption . . . illegible . . . as well for tachycardia, further evaluation was advised but not completed, and so those diagnoses are "working" diagnoses.

2.  As he has consistently in the medical records, Mr. Scippio reports that he continues to experience severe fatigue, frequently experiences uncontrollable diarrhea, and intermittently experiences back and leg pain.  His fatigue may be bad enough that he spends a large part of the day in bed one or two days per week and he may also have one or two days per week where he has diarrhea throughout the day with up to 10 episodes.  Particularly with respect to his complaints of chronic fatigue and uncontrollable diarrhea, are these current complaints consistent with his diagnoses as confirmed by objective evidence as noted above?  (I have requested Mr. Scippio document the frequency of his diarrhea and extent of his fatigue over an extended period of a week or two and have requested that he also obtain confirmation from another source, including his mother with whom he lives.  Once this information is available, I will forward it to you.)

[Did not check yes or no.]

Comments: I did not make the diagnosis of chronic fatigue.  I believe that where diabetes is so poorly controlled, fatigue is a common side effect.  The same can be true for diarrhea.  This is why I think that once DM is controlled, other problems can be corrected and if not, little progress can be done.  There is some medical noncompliance as documented in few of my notes 8/2/06 & 4/24/06 under HPI section unfortunately.

3.  You might not be aware that Mr. Scippio had a very solid work history from shortly after his graduation from high school through April 1, 2004 when he was no longer able to work productively on a regular set schedule meeting the demands imposed on him by his former employment.  In fact, prior to obtaining his more recent higher paying job, Mr. Scippio held 2 jobs.  Mr. Scippio would like to return to work in a position that would grant him flexibility to work on good days, take breaks as necessary and work in the very close vicinity of bathroom facilities. Would you recommend that Mr. Scippio pursue work in a position which would

grant him this type of flexibility?

[Checked yes.]

Comments: I do agree that Mr. Scippio would need some flexibility at his job and that a sedentary activity on a day to day basis would be appropriate.

4.  Mr. Scippio acknowledges, as you've opined that, that on good day he may be able to work 8 hours in a sedentary job provided there is ready access to bathroom facilities.  On the other hand, he notes that when he is having a bad day extreme fatigue and/or uncontrollable diarrhea prevents him from working productively.  Do you agree with the assessment of the insurance company's agent, Sasha Chipman, that Mr. Scippio is incapable of sustained sedentary activity on a day to day basis; i.e. that he is incapable of working productively on a regularly set schedule such as 8-5, 5 days per week.

[Checked no.]

Comments: This is my assessment, as per last note from clinic and I recommend very good compliance with his plan or care per current MD.  Once that is proven and provided that his medical condition gets worse or his diagnoses get changed my assessment may be different.  However, his current MD would comment on that.

(AR 356-58).

Scippio's final submission to FCL was an opinion on Scippio's ability to work given by Gil Spruance, a vocational expert.  (AR 361-367).  Scippio reported to Spruance that fatigue leaves him bedridden two days or more a month and unable to leave the house approximately two days per week.  (AR 363).  Scippio also reported that one or two days a week he has diarrhea throughout the day with as many as seven episodes a day.  (AR 363).  Spruance's primary concern was the amount of time Scippio's reported problems could cause him to miss from work. (AR 363). Spruance wrote  "an individual who must stay in bed 1-2 days per week will certainly exceed any acceptable level of 'sick days' by any employer in the competitive labor market." (AR 363).  Spruance also calculated that Scippio had the potential to miss up to an hour and a half of work for bathroom breaks on days his diarrhea was particularly bad.  (AR

363).  Based on Scippio's reports, Spruance concluded that Scippio's fatigue and chronic

diarrhea prevented him from being employable in the competitive labor market.  (AR 363).

### 2.  *FCL's Review of Scippio's Appeal Materials and Decision*

After an initial review of the new material Scippio submitted, Scippio's claim was

transferred to FCL's appeal unit. (AR 331). On appeal, FCL determined Scippio's file warranted

further medical review and transferred it to an independent consultant, Dr. Aslene Palmer.  (AR

310-20, 323).  Dr. Palmer submitted a report to FCL regarding her review of Scippio's claim.

(AR 310-20).

Dr. Palmer's report first summarizes the medical notes contained in the administrative

record.  (312-19).  Dr. Palmer then states, under "Medical Analysis,"

> [t]he primary medical condition [affecting Scippio's] ability to maintain employment
> appears to be his frequent diarrhea.  There is laboratory indication of [Scippio]
> having malabsorption syndrome . . . .  It has been established, however, that if he
> were to have sedentary work with close vicinity to bathroom facilities, [Scippio]
> would be able to maintain employment during the period 10/1/06 to present.  After
> all, [Scippio] has demonstrated that he is able to take lengthy car rides while taking
> frequent bathroom breaks without any problems.
>
> Dr. Bray agrees that some flexibility is needed on the job and that sedentary
> activity on a day to day basis would be appropriate.  She, however, does not agree
> that [Scippio] is not capable of sustained sedentary activity as per his last clinic visit
> on 8/2/06.  She feels that diarrhea will likely be less of a problem with the
> improvement of diabetic control.  It is impossible to draw any conclusion from the
> form submitted by [Dr. Bright] since, apart from listing [Scippio's] diagnoses, there
> is no supporting medical information.[5]
>
> [S]edentary occupations consistent with claimant's functional capacity, work
> experience, skills and education where ready bathroom access is available [have been
> identified].  Therefore, since adequate accommodations can be made for [Scippio]
> to maintain employment, the medical records do not justify a claim for continued
> limitation.

(AR 319).

---

[5] Scippio submitted Dr. Bright's notes from the visit when this form was generated after
FCL made the final decision on Scippio's claim and after filing suit in this Court.  (AR 293).

Dr. Palmer also noted that Scippio failed to follow his doctors' recommendations and questioned why someone - with reportedly disabling diarrhea - would miss appointments, fail to take prescriptions, and fail to submit stool samples that might have corrected or identified the problem.  (AR 320).  Dr. Palmer recognized that Scippio was denied a GI referral through We Care because of his income, but questioned why it took so many missed appointments to find out Scippio was ineligible for the program and other avenues to get help could be pursued. (AR 320).  Dr. Palmer also questioned whether Scippio was truthful when he told Dr. Bray that he took his insulin shots on time, but ate erratically, during his trip to Miami as "taking insulin in a timely manner and a poor eating schedule would place claimant at risk for dangerous hypoglycemic episodes if not outright insulin shock."  (AR 320).   After receiving Dr. Palmer's report, FCL concluded that the initial assessment of Scippio's claim was correct and refused to reverse the decision on appeal.  (AR 297). CDS informed Scippio that his administrative review was complete, and that if he disagreed with the decision he could bring a civil claim under The Employee Retirement Income Security Act ("ERISA").  (AR 301).

C.  Scippio's Complaint

On June 15, 2007, Scippio filed a complaint in this Court alleging that FCL wrongfully denied his LTD benefits in violation of ERISA.  (Doc. 1., Complaint).  Scippio seeks reinstatement of his disability benefits, consequential damages with interest, attorney fees, and costs from FCL.  (Doc. 1 at 4).  Scippio also requests that FCL be required to take steps to reinstate any other benefits he would have been entitled to if his LTD benefits had not been improperly denied.  (Doc. 1 at 4).  FCL responded to Scippio's complaint, denying any wrongdoing, and seeking attorneys' fees, costs, and any other relief the Court deems  proper.

(Doc. 4).  On November 28, 2007, both parties filed motions for summary judgment.  (Docs. 11

& 14).  On December 21, 2007, both parties responded to the opposing party's motion for

summary judgment.  (Docs. 26 & 27).

APPLICABLE LAW

Until recently, Eleventh Circuit courts evaluating the decision of an ERISA plan

administrator had to apply one of three different standards of review..  See Doyle v. Liberty Life

Assurance Co. of Boston, 511 F.3d 1336, 1339-40 (11th Cir. 2008).  If the administrator had no

discretion to determine eligibility for benefits or construe the terms of the plan, the courts

reviewed the administrator's decision *de novo*. Id. at 1339.  However, where the plan granted the

administrator discretion to construe the policy or determine eligibility the court had to give

deference to the administrator. Id. at 1340.  In those cases the courts reviewed the administrator's

decision under the deferential arbitrary and capricious standard, unless the administrator had a

conflict of interest.  Id.  If the administrator had discretion, but operated under a conflict of

interest, the courts reviewed the administrator's decision under the "heightened" arbitrary and

capricious standard.  Id.  However, the Supreme Court recently issued an opinion that affects the

way  ERISA claims should be reviewed.  See Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct.

2343 (2008).  Before considering the impact of Glenn, it is helpful to describe ERISA review

under prior Eleventh Circuit precedent.

Under pre-Glenn Eleventh Circuit precedent, a court reviewing the decision of an ERISA

plan administrator used the following  six step process:

> 1.  Apply the de novo standard to determine whether the claim administrator's
> benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's
> decision); if it is not, the end the inquiry and affirm the decision.

2. If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not end judicial inquiry and reverse the decision.

3. If the administrator's decision is "de novo wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4. If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5. If there is no conflict, then end the inquiry and affirm the decision.

6. If there is a conflict of interest, then apply the heightened arbitrary and capricious review to the decision to affirm or deny it.

Williams v. Bellsouth Telecomm., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004) (emphasis in original).

Glenn deals solely with the issue of how the existence of a conflict of interest should be treated. Under pre-Glenn precedent this required application of the "heightened" arbitrary and capricious standard. Id. This standard resulted in a burden shift from the claimant to the administrator once the claimant demonstrated that the administrator had a conflict of interest. Id. The administrator then had to prove his decision was not tainted by self interest. Id. The burden shift applied not only to plan interpretation cases, but also to cases involving factual determinations made by a conflicted administrator. Doyle v. Liberty Life Assurance Co., 511 F.3d 1336, 1342-43 (11th Cir. 2008). In factual determination cases this burden shift placed an exceptionally high burden on the administrator. Id. at 1345-46.

Glenn makes it clear that a conflict of interest should not result in the burden shifting to the administrator, but instead should be considered as a *factor* in determining whether the

administrator abused his discretion.[6]  Glenn, 128 S. Ct. at 2350-51 ("Neither do we believe it

necessary or desirable for courts to create special burden-of-proof rules, or other special

procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict.").  How a

conflict of interest should factor into a review of an ERISA plan administrator's denial decision

is somewhat unclear, but Glenn did elaborate.  As the Glenn Court stated,

> [w]e believe that *Firestone* means what the word "factor" implies, namely,
> that when the judges review the lawfulness of benefit denials, they will often take
> account of several different considerations of which a conflict of interest is one.
> . . .
> In such instances, any one factor will act as a tiebreaker when the other factors are
> closely balanced, the degree of closeness necessary depending upon the
> tiebreaking factor's inherent or case specific importance.  The conflict of interest
> at issue here, for example, should prove more important (perhaps of great
> importance) where circumstances suggest a higher likelihood that it affected the
> benefits decision, including, but not limited to, cases where an insurance company
> administrator has a history of biased claims administration.  It should prove less
> important (perhaps to the vanishing point) where the administrator has taken
> active steps to reduce potential bias and to promote accuracy, for example, by
> walling off claims administrators from those interested in firm finances, or by
> imposing management checks that penalize inaccurate decisionmaking
> irrespective of whom the inaccuracy benefits.

Glenn, 128 S. Ct. at 2351. (citations omitted)

The question now becomes how Glenn affects the framework the Eleventh Circuit has

established for reviewing ERISA claims.  While there is room for debate in some areas, it is clear

that the sixth step in the process no longer exists.  Using a conflict of interest as a *factor* is

incompatible with the prior precedent requiring a burden shift to the administrator after a conflict

was demonstrated.  However, the undersigned concludes that Glenn probably does not abrogate

---

[6]  Glenn speaks in terms of an "abuse of discretion" rather than arbitrary and capricious.
Glenn, 128 S. Ct. at 2350.  In the Eleventh Circuit the two phrases are given the same meaning.
Doyle, 511 F.3d at 1340 n.1.

the entire Eleventh Circuit framework.  Instead the process should now be truncated and reordered into the following method of analysis.

First, the Court should determine whether the administrator was vested with discretion under the terms of the policy.[7]  While this is generally left until later in the process, see Williams, 373 F.3d at 1138, it is important from the very beginning because it affects the evidence the Court can consider.  If the administrator had discretion, the Court may only consider the evidence  the administrator was aware of at the time the decision when determining whether the decision was *de novo* wrong.  Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008).  However, if the administrator had no discretion the Court is not limited to the facts known to the administrator at the time of the decision.  Kirwan v. Marriot Corp., 10 F.3d 784, 789 (11th Cir. 1994).

Once the Court determines whether the administrator possessed discretion, the Court should then consider the appropriate evidence *de novo* and determine whether the administrator's decision was "wrong."  The administrator's decision is "wrong" if "the court disagrees with the administrator's decision" after review from the *de novo* perspective.  Glazer, 524 F.3d at 1246. If the Court agrees with the administrator's decision, the decision should be affirmed.  Williams, 373 F.3d at 1138.  If the Court disagrees with the decision and the administrator did not have discretion the Court should reverse the administrator's decision.  Id.  If the Court disagrees with the administrator's decision, but the administrator did have discretion, the Court must proceed to the next step.  See id.

---

[7]  For the administrator to have discretion the benefits plan must expressly provide the administrator discretion to make eligibility determinations or construe the terms of the plan. Kirwan v. Marriot Corp., 10 F.3d 784, 788 (11th Cir. 1994).

The next step in the evaluation requires the Court to apply the arbitrary and capricious standard to the administrator's *de novo* "wrong" decision.  <u>See id</u>.  At this stage <u>Glenn</u> requires a departure from earlier Eleventh Circuit precedent.  Because <u>Glenn</u> directs that a conflict of interest should be considered as a factor in determining whether the administrator's decision was an abuse of discretion (arbitrary and capricious in the Eleventh Circuit), the Court should determine whether the administrator operated under a conflict of interest prior to looking at whether the administrator's decision was arbitrary and capricious.  Once the Court has determined whether the administrator operated under a conflict of interest, the Court should then consider whether the administrator's decision was arbitrary and capricious.

For cases that do not involve a conflict of interest, <u>Glenn</u> did not modify the prior Eleventh Circuit case law.  In those cases, the administrator's decision should be affirmed if there are reasonable grounds in the record to support the decision.  <u>Williams</u>, 373 F.3d at 1138.  However, in cases involving a conflict of interest, <u>Glenn</u> requires the Court to consider the conflict of interest at this point.  <u>See Glenn</u>, 128 S. Ct. at 2350-52.  Therefore, if the administrator acted under a conflict of interest, the appropriate question is whether there are reasonable grounds in the record to support the administrator's decision after factoring in the conflict.  Essentially, the conflict of interest changes the level of deference given to the administrator's decision depending on the particular facts of the case.  The higher the likelihood that the administrator's decision was affected by the conflict of interest the higher the level of reasonableness the administrator's decision must possess.  <u>See id</u>.  If the Court determines that the conflicted administrator's decision meets the arbitrary and capricious standard after taking into account the administrator's conflict, then the Court should affirm the administrator's

decision.  See id.  However, if the Court finds that administrator's decision does not meet the

arbitrary and capricious standard, either because it was unreasonable to begin with or

unreasonable once the administrator's conflict is taken into account, the Court should reverse the

administrator's decision.  See id.; see also Williams, 373 F.3d at 1138.

APPLICATION

        We turn now to the facts of this case.  As an initial matter, the Plan grants FCL discretion

to interpret the terms of the policy and determine eligibility for benefits.  (AR 108).  Scippio

concedes that FCL was vested with discretion.  (Doc. 14 at 16 n.8).  Therefore, FCL's decision

will ultimately be reviewed under the deferential arbitrary and capricious standard.  See Doyle,

511 F.3d at 1339-40.

        A.      Was FCL's Decision Wrong?

        The Court should now proceed to determine whether FCL's decision was *de novo* wrong.

FCL's decision is "wrong" if the Court disagrees with the decision after review from the *de novo*

perspective.  Glazer, 524 F.3d at 1246.  However, because FCL had discretion under the terms of

the policy, the Court may only consider the information FCL was aware of it when it made its

decision.  Id.  For the following reasons, the Court concludes that FCL's decision was wrong.

        There is little dispute over whether Scippio actually suffers from frequent diarrhea.  The

record contains medical notes reflecting Scippio's ongoing problem with diarrhea and also

provides objective medical reasons for the diarrhea.[8]  The dispute is over whether Scippio's

problems with diarrhea render him disabled under the terms of the plan.  At the time Scippio's

---

        [8] Scippio was diagnosed with malabsorption syndrome.  (AR 522).  Diarrhea is also a
common side effect of poorly controlled diabetes.  (AR 357).

benefits were terminated he was "disabled" under the Plan if he was "not able to perform the material and substantial duties of any gainful occupation[9]." (AR 93). Therefore, the appropriate inquiry is whether Scippio was capable of performing the material and substantial duties of a gainful occupation when his benefits were terminated on September 30, 2006.

A "material and substantial duty" is a duty that is "normally required for the performance of the occupation . . . and cannot be reasonably omitted or changed." (AR 93). Material and substantial duties means more than the simple physical tasks (i.e. pushing, pulling, sitting) associated with a job. The term also logically includes being consistently present as scheduled and being able to work productively while there. FCL recognized this when Scippio's LTD benefits were continued after Dr. Beard reported that Scippio was *physically* capable of performing numerous tasks, but could not return to work due to his problems with diarrhea. (AR 598-600). The record contains only one report that specifically addresses whether Scippio is capable of working productively - the report of Scippio's own vocational expert, Gil Spruance. (AR 361-67).[10] Therefore, if Spruance based his opinion on reliable information, this Court has

---

[9] The Plan had two definitions of "disabled" based on how long the employee had been receiving long term disability. For the first two years, the employee would be considered disabled under the terms of the Plan if he was unable to perform the material and substantial duties of his "own occupation" -- that is, his prior job at RTI. (See AR 93-94). However, after two years of LTD payments the Plan's definition of disabled changed. As of June 30, 2006, Scippio was only eligible for continuing LTD payments ony if he was unable to perform the material and substantial duties of any "gainful occupation." (AR 93 & 509). "Gainful occupation" is an occupation that, considering qualifications, "provides or can be expected to provide you, within 12 months of your return to work, with an income (before taxes) at least equal to your gross monthly payment." (AR 94). A "gainful occupation" for Scippio would pay him, within 12 months of his return to work, $6.44 an hour for a forty hour work week or a total of $1116.96 per month before taxes. (See AR 100, 234, 650, 820).

[10] Neither Dr. Palmer nor O'Malley addressed the effect Scippio's reported condition would have on his ability to engage in productive work. Dr. Palmer assumed that being on the

no reason to doubt his conclusions.  Because Spruance based his opinion primarily on Scippio's own  reports the question is whether Scippio's reports are reliable.

Judging the credibility of Scippio's claims is difficult due to the manner in which the Court must review FCL's decision.  A written administrative record provides no demeanor evidence.  However, several human actors, including Dr. Ashley and Dr. Beard, had an opportunity to assess Scippio's credibility firsthand.  Because Dr. Ashley and Dr. Beard both supported Scippio in obtaining disability payments, (AR 598-600, 818), they clearly believed Scippio's reports.  Dr. Ashley and Dr. Beard both lend credence to Scippio's reports.  Each doctor had ample opportunity to evaluate Scippio's medical condition and make a face-to-face assessment of whether Scippio was being truthful or not.

Although Dr. Beard and Dr. Ashley lend support to Scippio's claim, using their opinions alone to establish Scippio's disability creates problems.  First, both opinions were probably affected by the fact that Scippio worked in a protective suit at RTI and was unable to get to the bathroom quickly.  (AR 586, 814).  Getting to a bathroom would not be a problem with many jobs.  That being said, having to go to the bathroom frequently and at unscheduled times would create problems at most jobs, including those O'Malley identified.[11] At the very least, Dr. Beard and Dr. Ashley believed Scippio's reports that his bouts of diarrhea came upon him quickly and

---

job site and being able to get to the bathroom quickly would allow Scippio to engage in a gainful occupation.  (AR 319).  O'Malley's assessment only addressed the availability of occupations in the Gainesville area that Scippio was *physically* capable of performing.  (AR 438-41)

[11]  O'Malley notes that the jobs she identified generally offer *scheduled* breaks.  (AR 440)  Scippio correctly notes that the jobs O'Malley identified do not logically lend themselves to frequent unscheduled breaks.  (Doc. 26 at 15 n.9)  With the possible exception of a small parts assembler, none of the jobs O'Malley identified would seem to allow the employee to go missing at random times for five or ten minutes.

that he was unable to control them long enough to get out of a protective suit and to the bathroom.  They also seemed to believe this occurred quite often or they would not have concluded Scippio could not work.

The second problem in using these doctors' opinions is that a substantial amount of time passed between Dr. Beard's assessment and the termination of Scippio's LTD benefits. However, the passage of time only creates problems if Scippio's condition, or some other factor, changed during that time.  Dr. Beard and Dr. Ashley both judged Scippio's credibility and determined that his complaints were honest.  While it is impossible to say that either doctor believed Scippio could not work in any gainful occupation at that time, they certainly both believed he could not work for RTI when they filled out their questionnaires.  In order to come to that conclusion they had to credit Scippio's own reports regarding the extent and severity of his condition.  The question is whether something changed between the time Dr. Beard made his assessment and the time when Scippio's benefits were terminated that suggested he was no longer disabled.

As far as Scippio's medical records are concerned, there was little change between the time Dr. Beard evaluated him and the time Dr. Bray evaluated him.  There are times in the record where Scippio's diarrhea seems to have improved, (e.g.; AR 523), but, in general, Scippio's condition seems to have stayed basically the same throughout.  In March 2005, an assessment by Marcia Knapp noted that Scippio's continuing problems with diarrhea were evidenced by his "cathectic appearance" and the presence of temporal wasting.[12]  (AR 577).   Knapp also noted

---

[12]  While the term "cathectic" is used in both Dr. Beard's notes and nurse Knapp's notes, the intended term is likely "cachectic" which would indicate Scippio suffered from weight loss, muscle wasting, and appetite loss.  See http://medical-dictionary.thefreedictionary.com/cachexia

that, although she believed Scippio had the potential for fundamental improvement, there was no indication that his condition had improved at that time.  (AR 578).  The medical notes from Scippio's treating physicians never show the fundamental improvement that Knapp alluded to. There are instances where Scippio's diarrhea seems to have improved.  (e.g., AR 523).  During those office visits Scippio's diabetes was also under better control.  This is not surprising considering that Dr. Bray believed Scippio's diarrhea was partially caused by his uncontrolled diabetes.[13]  (AR 343).  However, looking at the medical notes as a whole, both Scippio's diarrhea and his diabetes, although they did fluctuate at times, remained largely unchanged during the period between Dr. Beard's assessment and Dr. Bray's assessment.

Because Scippio's medical condition does not seem to have changed, it is necessary to consider whether anything else changed that would have made Scippio capable of working when he was not capable of doing so before.  One thing that changed between Dr. Beard's assessment and Dr. Bray's assessment was the definition of disabled under the Plan.  When Dr. Beard gave

_____

(last visited July 10, 2008).

[13] FCL asserts that "noncompliance" with doctor's recommendations, by itself, is enough to terminate Scippio's benefits under the Plan.  Although the Plan does require Scippio to maintain a certain level of medical compliance in order to continue receiving LTD payments FCL's argument fails for two reasons.  First, most of the non-compliance seems to be a result of Scippio's lack of resources to comply with medical recommendations.  (See, e.g., AR 347, 448). FCL recognized Scippio was having trouble obtaining medicine and suggested treatments due to financial difficulties.  (E.g., AR 448).  Second, FCL's decision to terminate Scippio's benefits did not rest on his failure to maintain appropriate medical care.  In both denial letters the stated reason for the denial was that FCL did not believe Scippio met the definition of disabled.  (AR 297-301, 408-11).  The only time non-compliance comes up is in passing, during Dr. Palmer's review of Scippio's claim. Although this Court is not prohibited from considering FCL's *post hoc* justifications for its decision, see Tippitt v. Reliance Standard Life Ins. Co., 2008 WL 1875968 at *3 (11th Cir. 2008), this justification should probably be given little weight.  There is some non-compliance, but FCL did not consider it serious enough to terminate Scippio's benefits and Scippio had a legitimate reason for the vast majority of noncompliance.

his assessment, Scippio was disabled if he could not return to his job at RTI.  By the time Dr.

Bray made her assessment Scippio was disabled only if he was unable to perform the duties of

any "gainful occupation."

Whether this distinction made any difference to Dr. Ashley and Dr. Beard is debatable,[14]

but, assuming it did, their opinions still deserve consideration.  Even though Dr. Ashley and Dr.

Beard seem to be primarily concerned with Scippio being able to get to a bathroom in time, their

opinions show that Scippio's problems with diarrhea and urgency must have been frequent.  If

the problems were not frequent, it is unlikely that either doctor would have believed Scippio was

disabled.

Ultimately the reason Dr. Ashley and Dr. Beard are important to Scippio's claim is that

they believed his self-reports and thus add credibility to the reports.  If Scippio's self reports

were credible when Dr. Beard made his assessment, and nothing has changed since then other

than the definition of disabled, then vocational expert Spruance's opinion is relevant and

persuasive.  According to Spruance, Scippio is incapable of working in a gainful occupation.

(AR 363).

Moreover, two of Scippio's treating physicians had the opportunity to assess the

truthfulness of Scippio's claims after the "gainful occupation" period began.  The most recent of

those is Dr. Bright.  Dr. Bright stated in January 2007 that Scippio would be unable to work for

twelve months due to his diabetes and chronic malabsorption. (AR 355).  Scippio visited Dr.

---

[14]  The form Dr. Beard filled out asked "can [Scippio] now return to former occupation?"
and "can [Scippio] return to work full-time according to the restrictions defined above?" (AR
599).  Dr. Beard answered "No" to both questions.  (AR 599).  Therefore, it could be argued that
Dr. Beard was expressing his opinion that Scippio was disabled even under the "gainful
occupation" definition of disabled.

Bright in person and Dr. Bright had an opportunity to assess Scippio's credibility firsthand. Clearly, Dr. Bright believed Scippio's claims.[15]

The second doctor who had the opportunity to observe Scippio firsthand and assess the truthfulness of his claims was Dr. Bray, who seemed to believe Scippio was capable of returning to work without restrictions at the time she filled out the form for FCL.[16] (AR 447). The question is why did Dr. Bray disagree with Scippio's previous doctors, Dr. Ashley and Dr. Beard, and Scippio's later doctor, Dr. Bright. There are at least four possible reasons for the disagreement, none of which is sufficient to sway the Court.

The first reason Dr. Bray may have disagreed with Scippio's other doctors is because she might have thought that Scippio's condition had improved since the time Dr. Beard made his assessment. However, as discussed previously, the record does not show that Scippio's condition improved for any extended period of time. Diarrhea was a consistent complaint throughout Scippio's medical records and none of his doctors ever noted any significant improvement for more than one or two office visits.

Dr. Bray's own assessment suggests that Scippio's overall condition, although not specifically the diarrhea, was actually deteriorating. By the time Dr. Bray assessed Scippio he

---

[15]  FCL maintains that Dr. Bright's assessment should be given little weight because Scippio was doctor "shopping." However, Dr. Bright was at the same practice as Dr. Bray. (AR 360). Scippio has consistently been treated by doctors at the University of Florida Family Medicine Clinic. Because Dr. Bright was a physician at that clinic and Scippio has had multiple doctors at that clinic throughout the time he received disability payments, there is no reason to draw the inference that Scippio was "shopping" for an opinion contrary to Dr. Bray's.

[16]  This is certainly open to debate. If Scippio's counsel had not posed follow up questions to Dr. Bray, the form she filled out would be even more ambiguous. Dr. Bray simply circled "Without Restrictions" when asked to give an estimated return to work date. (AR 447).

was only capable of occasionally lifting up to thirty pounds and engage in a sedentary occupation. (AR 446). However, when Dr. Beard assessed Scippio, Scippio was capable of lifting up to twenty pounds continuously, fifty pounds frequently, and one hundred pounds occasionally. (AR 598). These differences suggest that Scippio's general condition had not improved. Dr. Bright's assessment also suggests that Scippio's problem with diarrhea had not improved. (AR 355). Although Dr. Bray may have believed Scippio's condition had improved to the point that he was able to work productively, it seems unlikely that this was the basis for her opinion and, if it were, her opinion is unsupported by the record.

Dr. Bray may have believed Scippio could return to work because she did not think that Scippio's diarrhea, even at the frequency and severity Scippio reported, would impair his ability to work in a gainful occupation. Although Dr. Bray is certainly allowed to give her opinion, work productivity is outside of her field of expertise. Any judgments regarding the level of impairment Scippio would face if his symptoms were as reported should be deferred to the only person with experience in this area who actually considered Scippio's own reports - vocational expert Gil Spruance.

A third reason Dr. Bray may have believed Scippio could return to work is because she failed to consider the impact diarrhea would have on his ability to work when she gave her assessment. The assessment Dr. Bray filled out never mentioned diarrhea, although it did mention diabetes. (AR 446-47). More importantly, the letter to Dr. Bray from nurse Murphy never mentions diarrhea as a possible cause for Scippio's disability. (AR 444). Nurse Murphy talks only about normalizing Scippio's schedule in an effort to control his diabetes. (AR 444). Prior to the responses Dr. Bray gave Scippio's counsel there is no indication in the record that

Dr. Bray was aware Scippio's disability was primarily due to his problems with diarrhea.  More importantly, when Scippio's counsel asked Dr. Bray if she would agree with the recommendation that Scippio find a flexible job, Dr. Bray agreed that Scippio needed "some flexibility" although sedentary activity on a day to day basis would be appropriate.  (AR 358).  This contrasts with the "Without Restrictions" answer Dr. Bray gave initially (AR 447) and suggests that Dr. Bray never considered the impact diarrhea would have on Scippio's ability to work when giving her initial report.  Even assuming Dr. Bray considered the impact diarrhea would have on Scippio, this brings her back into opining on matters that are more within the purview of  a vocational expert such as Gil Spruance.

The final reason Dr. Bray may have disagreed with Scippio's other doctors is because she thought Scippio was untruthful regarding the severity and extent of his diarrheal episodes.  If Scippio *was* exaggerating his problems with diarrhea, then Spruance's opinion would not be helpful.  It is not clear that Dr. Bray thought Scippio was lying or exaggerating.  Dr. Bray said Scippio would need flexibility in his job, which suggests she credited his subjective complaints.  Moreover, even if Dr. Bray did not believe Scippio, her conclusion would conflict with the credibility assessments of every other person who dealt with Scippio over the years.  It would conflict with the opinions of Dr. Ashley, Dr. Beard, and Dr. Bright.  Dr. Bray's assessment also conflicts with FCL's case managers who interviewed Scippio firsthand.  None of those case managers ever made a note or suggested that Scippio's reports might be exaggerated.[17]  Further, Dr. Bray's assessment would also seem to contradict all of the other doctors who dealt with

---

[17]  Nurse Murphy did imply in her letter to Dr. Bray that Scippio was exaggerating, but Murphy seems to have based her assertion on the Miami trip rather than firsthand dealings with Scippio.  As discussed later, this trip does not undermine Scippio's reports.

Scippio firsthand.  There is nothing in the record that indicates any of Scippio's physicians, save

Dr. Bray, believed he was exaggerating.  Dr. Bray (possibly) believing Scippio was being

untruthful is not enough to overcome the numerous other people who had a chance to consider

Scippio's reports and conclude that they were true.

        In sum, there are various reasons why Dr. Bray may have opined that Scippio could work

"Without Restrictions."  However, none of these reasons discredit Scippio's claim.  Scippio's

condition had not improved and Dr. Bray was not as qualified as Spruance to determine the

effect Scippio's condition would have on productivity or employability.  Dr. Bray was capable of

assessing the truthfulness of Scippio's claims.  However, even assuming Dr. Bray did not believe

Scippio, the record fails to establish up to this point that Scippio's reports were exaggerated.

Other than Murphy and Dr. Palmer, neither of whom seems to have ever dealt directly with

Scippio, no one  has ever expressed doubt about the accuracy of Scippio's reports.  Dr. Bray's

assessment is not enough to overcome the credibility assessments of everyone else who dealt

with Scippio firsthand.

        With no reason to doubt Scippio's reports, and therefore Spruance's opinion, based on

Dr. Bray's assessment, it is necessary to determine if there is any other evidence in the record

that tends to show Scippio exaggerated.  FCL, through Murphy, suggests that Scippio staying out

late at night with friends shows he is capable of working.  To begin with, there is no support for

Murphy's assertion in the record, and Scippio maintains that it is false. (AR 360).  Even

assuming Murphy's assertion is true, it does not undermine Scippio's credibility.  Scippio has

never said that he spends every waking moment on the commode.  Being out with friends, even

late at night, says little about how productive one can be at work.

FCL, through Dr. Palmer, also suggests that the car trip Scippio took to Miami casts doubt on his credibility and shows that he is able to work.  Dr. Palmer maintains that this trip "proves" Scippio can work as long as he is close to a bathroom.  Dr. Palmer's conclusion is flawed for several reasons.  First, it ignores the fact that Scippio must consistently be present to perform the material and substantial duties of a gainful occupation.  Second, being able to take a car trip, that takes less than a day, says nothing about what Scippio is capable of on a day to day basis.  Scippio reported, and Dr. Palmer seems to accept, that he took frequent bathroom breaks during the trip.  Although Dr. Palmer sees these frequent bathroom breaks as the reason Scippio can work, (AR 319), the reverse is actually the truth.  Spruance opined that having to take frequent and unscheduled bathroom breaks would prevent Scippio from working in the fields O'Malley identified.  Further, Dr. Palmer fails to consider that Scippio may have fasted in order to help control his diarrhea during the trip.

The third reason FCL suggests Scippio is being less than honest is because he said that he fasted and ate erratically during his trip to Miami, but still took his insulin on the normal schedule.  Dr. Palmer doubts Scippio's honesty because taking insulin on time and maintaining a poor eating schedule would place him at risk of a dangerous hypoglycemic episode or possibly insulin shock.  (AR 320).  However, there is no reason to doubt Scippio's statements.  Scippio was seemingly unaware that this practice placed him at risk of danger.  If he were aware that the practice was dangerous he would not have told Dr. Bray.  (AR 459).  Further, Leclere was present when Scippio told Dr. Bray what he had done, and Leclere made no mention of Dr. Bray informing Scippio that the practice was dangerous.  This fact suggests that Dr. Palmer may have been misinterpreting what Scippio actually did.  Surely Dr. Bray would have warned Scippio that

he was placing himself in danger if the facts were as Dr. Palmer interpreted them.

The final reason FCL suggests Scippio was exaggerating his reports was because he failed to promptly follow through on everything his doctors recommended.  Much of this seems to be attributable to a lack of funds.  However, Dr. Palmer does point out that Scippio failed to attend appointments with We Care that would have allowed him to find out he was ineligible for the program sooner. (AR 320).  Dr. Palmer then raises the question of why someone with problems as severe as Scippio claims would continually miss scheduled appointments that may have helped his condition.  (AR 320).  While this does raise questions about Scippio's credibility, it is not enough to overcome the credibility assessments of the people who dealt with Scippio firsthand and found him to be credible.

In sum, Scippio's self reports are credible for several reasons.  No treating physician other than Dr. Bray ever hinted that Scippio's reports might be exaggerated.  Dr. Bray herself seemed to have believed Scippio to some extent, and, even if she did not, her assessment was not sufficient to overcome the credibility assessments of everyone else involved with the case.  Finally, although Dr. Palmer does raise one point that suggests Scippio may have been exaggerating, it is not enough, even in conjunction with Dr. Bray's possible disbelief, to discount Scippio's own complaints when one considers the judgments made by the other people who dealt with Scippio.  Because Scippio's self reports are credible, the basis of Spruance's opinion is sound and FCL's decision to deny Scippio continuing benefits was *de novo* "wrong."  Because FCL's decision was "wrong" on *de novo* review the Court must now consider whether FCL's decision should be affirmed under the deferential arbitrary and capricious standard.

B.     Was FCL's Decision Arbitrary and Capricious?

Because the Court disagrees with FCL's decision to deny Scippio continuing LTD payments, the Court must now consider whether FCL's decision passes muster under the arbitrary and capricious standard.  As an initial matter, FCL admits that it was operating under a conflict of interest.  (Doc. 4 ¶ 11).  Because of <u>Glenn</u>, the appropriate question is whether there are reasonable grounds in the record, taking into account FCL's conflict, to support FCL's *de novo* wrong decision.

This case falls on the borderline of reasonableness.  FCL did have two reasons to terminate Scippio's benefits - Dr. Bray's initial opinion and Dr. Palmer's paper review.  However, considering the history of Scippio's problems and FCL's conflict of interest, it was unreasonable for FCL to terminate Scippio's benefits.  FCL argues that Scippio's claim was but a small piece of FCL's pie and therefore FCL's conflict never came into play when Scippio's benefits were terminated.  This argument is without merit.  Regardless of how small Scippio's claim was, money would still be coming out of FCL's pocket. Further, the record seems to demonstrate that FCL's conflict of interest actually played a role in the decision to terminate Scippio's payments.  FCL's unreasonableness is shown by the path it took in terminating Scippio's benefits.

First, nurse Murphy sent Dr. Bray a self-serving letter implying that the only thing preventing Scippio from working was a doctor's release. (AR 452).  The letter was not an evenhanded attempt to determine the extent of Scippio's problems, but a plea for a favorable opinion.  Nurse Murphy requested that Dr. Bray give a medical rational for her assessment if she believed Scippio was unable to return to work, but never requested that Dr. Bray address why her opinion differed from the previous physicians if she believed Scippio was able to return to

work. (AR 452). The self-serving nature of the letter demonstrates FCL's conflict. However, that alone would not be enough to make FCL's decision unreasonable if Dr. Bray truly believed, after actually considering diarrhea as a possible cause of disability, that Scippio was capable of productively working in a sedentary occupation. However, there is no evidence in the record that suggests Dr. Bray was aware of the reason for Scippio's disabled status. Nurse Murphy never mentioned it in her letter, (AR 452), and Dr. Bray never mentioned it in her response to FCL. (AR 446-47). The first time Dr. Bray for sure knew that Scippio's primary complaint was diarrhea, was when Scippio's counsel wrote to her after Scippio's benefits were terminated. Then, although Dr. Bray still believed Scippio was capable of performing sedentary work on a day to day basis, she acknowledged that Scippio would need flexibility in his work schedule. (AR 357-58).

Second, FCL handled Scippio's claim unreasonably after Dr. Bray's assessment was received. Despite the fact that Dr. Bray never filled in a date of when Scippio could return to work, FCL immediately set into motion a chain of events aimed at terminating Scippio's benefits. FCL relied entirely on a circle around "Without Restrictions"[18] and the comment "needs close follow up of his diabetes" to terminate Scippio's benefits. (AR 447). FCL never asked Dr. Bray to clarify her opinion or why she believed as she did, even though the physical capacities Dr. Bray identified were significantly lower than those Dr. Beard set forth in his assessment. Dr. Bray never mentioned diarrhea, the primary cause of Scippio's past inability to

---

[18] The form asked for the doctor to specify a date when the patient could return to work and then asked the doctor whether the return would be "With Restrictions" or "Without Restrictions." Dr. Bray did not put any date in the blank. Instead, she simply circled "Without Restrictions." (AR 447).

work, but FCL never bothered to question this omission.  Dr. Bray's assessment was never even

remotely questioned internally by FCL.

Compare this to the original process of granting benefits.  When Dr. Ashley wrote in

support of Scippio's claim for disability, FCL immediately asked Dr. Ashley to clarify why

Scippio could not work.  (AR 815). When Dr. Beard supported Scippio's continuing disability

FCL did not continue Scippio's benefits on Dr. Beard's word alone.  Instead, nurse Knapp

reviewed Scippio's file to ensure Dr. Beard's opinion was "reasonable."  (AR 578).  In contrast,

when FCL received Dr. Bray's favorable opinion, there were no requests for clarification or

reviews to ensure Dr. Bray's opinion was reasonable.  FCL simply asked O'Malley to locate

occupations Scippio was capable of performing according to Dr. Bray.  Once O'Malley found

those jobs Scippio's benefits were terminated.

Although FCL acted unreasonably when it initially terminated Scippio's benefits its

decision might be saved by reasonableness during the appeals process.  However, FCL's

decision on appeal is also unreasonable and appears tainted by a conflict of interest.  While FCL

took a step in the right direction by hiring an independent consultant, Dr. Palmer, to review

Scippio's file, the Court does not find the reasoning of Dr. Palmer persuasive.

The report takes two different approaches to discredit Scippio's claim.  First, Dr. Palmer

attempts to establish that diarrhea, even as severe and frequent as reported by Scippio, do not

support a claim for disability.  Dr. Palmer's report says that "[i]t has been established . . . that if

he were to have sedentary work with close vicinity to bathroom facilities, [Scippio] would be

able to maintain employment during the period of 10/1/06 to present."  (AR 319).  Dr. Palmer

comes to this conclusion based on the fact that Scippio was able to make a trip to Miami with

frequent bathroom breaks.  (AR 319).  Dr. Palmer is wrong and unreasonable to draw the

conclusion that Scippio can return to work based on two car trips (there and back).  In an attempt

to buttress this logic, Dr. Palmer looks to Dr. Bray.  In Dr. Palmer's words "Dr. Bray agrees that

some flexibility is needed on the job and that sedentary activity on a day to day basis would be

appropriate.  She, however, does not agree that [Scippio] is not capable of sustained sedentary

activity . . . ."  (AR 319).  Dr. Bray's opinion does not save Dr. Palmer's faulty logic, Dr. Bray is

not qualified to make an assessment of how Scippio's ability to work would be impacted if his

condition was as he reported. [19]  However, Dr. Bray *is* qualified to determine whether Scippio's

reports are consistent with his objective condition.  In this respect Dr. Bray acknowledged that

Scippio's reports were consistent by saying that Scippio would need flexibility and diabetes

commonly results in diarrhea and fatigue. (AR 357-58).  It was wrong and unreasonable for Dr.

Palmer to conclude that Scippio could work even if his condition was as severe as he reported it.

The second way Dr. Palmer attempts to discredit Scippio's claim is by trying to cast

doubt on Scippio's truthfulness.  However, Dr. Palmer was in no position to judge Scippio's

credibility.  Dr. Bray is the only person who dealt with Scippio firsthand that seems to have

discounted Scippio's claims.  However, even Dr. Bray does not seem to have entirely doubted

Scippio or she would not have agreed that he needed flexibility in his job.  Dr. Palmer also notes

several things in the record that seem to cast doubt on Scippio's claims.  These discrepancies are

---

[19]  It is also telling that Dr. Palmer failed to even mention Spruance's opinion in contrast
to Dr. Bray and the Miami trip.  While doctors may be perfectly capable of determining how an
illness impacts a patients physical capabilities, few doctors are trained to assess how productivity
and employability would be affected.  Dr. Palmer's failure to even mention Spruance's report in
the conclusion or medical analysis portions of the report further illustrate the lack of
reasonableness in the opinion.

not enough to reasonably conclude that Scippio duped the people he interacted with firsthand.

Faced with determining the accuracy of Scippio's reports, Dr. Palmer accepted the judgment of

Dr. Bray, who was at best ambiguous on the issue, and a few discrepancies in Scippio's reports,

over the credibility judgment of all the other doctors and case managers involved with Scippio's

claim.  Doing so was unreasonable.  Because Dr. Palmer's opinion was unsupported by reason,

FCL acted unreasonably by relying on it.

In conclusion, therefore, FCL's initial decision to terminate Scippio's LTD payments was

unreasonable.  On administrative appeal, FCL unreasonably relied on Dr. Palmer's report to

support its initial decision.  Thus, FCL's decision was both "wrong" and unsupported by

reasonable grounds in the record when the apparent conflict of interest is factored in.  Therefore,

under the <u>Glenn</u> analysis, the Court must reverse the decision of the administrator.  Accordingly

it is hereby

**ORDERED AND ADJUDGED:**

Scippio's motion for summary judgment (doc. 14) is granted and FCL's motion for summary judgment (doc. 11) is denied.

The motions to correct misstatements (docs. 28 and 30) are denied as unnecessary. However, the Court considered the arguments contained therein and in the responses thereto.

**DONE AND ORDERED** this  *6th*   day of November, 2008

*s/Maurice M. Paul*
Maurice M. Paul, Senior District Judge